**KENNEDY'S ESTATE et al. v. RICHARD-SON et al.**

No. 7564.

Court of Civil Appeals of Texas. Austin.

May 13, 1931.

Rehearing Denied June 3, 1931.

Collins, Jackson & Snodgrass, of San Angelo, for appellants.

W. A. Wright, Chas. Gibbs, and J. J. Yowell, all of San Angelo, for appellees.

McCLENDON, C. J.

Appeal by the proponent of the will of Isabella R. Kennedy, deceased, from a judgment of the district court upon a special issue verdict, sustaining a contest of the will on the ground of want of testamentary capacity in the testatrix.

Testatrix executed two wills on the same day, referred to, respectively, as the Scotch and American wills. The former was admitted to probate in Scotland. The present proceeding was brought in the county court seeking probate of the American will, by which all of the property of the testatrix in the United States was devised to proponent in trust to convert into money and remit the proceeds to the trustees of the Scotch will. Proponent contends that the Scotch will disposed of all property of testatrix, and that the American will was merely an administrative device, executed for the purpose of facilitating transfer of the property in America to the Scotch trustees, and that under the treaty between the United States and Great Britain, the probate of the Scotch will passed title to all property of testatrix in the United States, and that therefore the contestants who were heirs at law of the testatrix had no interest in the probate of the American will. Other questions involved in the appeal relate to the action of the trial court in refusing a directed verdict; in its definition of "testamentary capacity"; and in the admission of testimony—the latter in the main involving the disqualification of witnesses under R. S. art. 3716.

The controlling facts disclosed by the record follow: Isabella R. Kennedy and her

husband, John Kennedy, natives of Scotland, moved to Texas in the early '80's, where a large estate was accumulated, all of which was community property, and where John Kennedy became a naturalized citizen of the United States. About the year 1912 they went back to Scotland, where John Kennedy died in March, 1927, and Isabella R. Kennedy died in January, 1928. Whether the latter was a citizen of the United States at the time of her death was a contested fact issue, which we find unnecessary to determine. Our holding assumes appellant's contention that she was a subject of Great Britain. Mr. and Mrs. Kennedy were childless, and their heirs at law were their respective brothers and sisters, nieces and nephews. By the will of John Kennedy, a life estate in all his property was vested in his wife, with remainder to his own kindred.

On August 29, 1927, Mrs. Kennedy executed the two wills. By the Scotch will she devised all of her property to trustees in Scotland, the proceeds to be disposed of by a number of small bequests to her several brothers and sisters, a small amount to be reserved for a designated purpose, and the remainder to be divided into four equal parts, to go one part each to four of the brothers and sisters of her deceased husband, all of whom were subjects of Great Britain. The will in terms disposed of all property of the testatrix wheresoever situated. The American will devised all of her property in the United States to proponent, Central National Bank of San Angelo, in trust to be converted by the trustee into money and remitted to the Scotch trustees. This will provided that it was made "for the purpose only of disposing of the estate and property hereinafter mentioned, and to the intent that the same shall take effect concurrently with and independently of another will of even date herewith relating to my property situate in Great Britain, and not in any way affecting the property hereby disposed of." The Scotch will made no reference to the American will. Appellees contend that proof of its probate in Scotland was insufficient. In the view we take of the case, this question is unimportant, and we therefore assume that proper probate in Scotland was shown. Proponent (executor and trustee under the American will) filed the American will for probate in Tom Green county. George and James Richardson, brothers of testatrix, filed a contest, setting up want of testamentary capacity in the testatrix. The will was admitted to probate in the county court, and contestants appealed to the district court. There for the first time proponent interposed by way of plea in abatement the defense to the contest on the ground above stated. This plea was overruled, and the cause tried upon its merits, with the above-named result.

■ It is appellant's contention that the two wills were executed simultaneously, the Scotch being the primary will and the American being merely an administrative document for the purpose of facilitating administration of the estate under the Scotch will; that all of the testatrix's property passed under the Scotch will by virtue of the probate in Scotland, regardless of whether that will was filed for probate in Texas under our Texas law, the contention in this regard being that, although to vest title in Texas real estate it is essential under Texas statutes that the will be admitted to probate in Texas, the treaty between the United States and Great Britain abrogated the local law in that regard as to British subjects, and passed the title to the Texas property independently of any local laws requiring its probate in Texas. Appellees contend that the American will shows on its face that it was executed subsequently to the Scotch will, although on the same day, and expressly repeals all provisions of the Scotch will purporting to pass title to any property in America belonging to the testatrix. We think it immaterial whether the two wills were executed simultaneously. Manifestly they were intended to take effect simultaneously and together dispose of all property of testatrix. The American will in express terms referred to the Scotch will, disposed of all property in America belonging to testatrix, and by express language above quoted limited the Scotch will as applicable only to testatrix' property situate in Great Britain. The language, "and not in any way affecting the property hereby disposed of," expressly excludes from the Scotch will the property disposed of in the American will. Conceding that the object in view was to facilitate the administration of the testatrix' estate and ultimately to deliver the proceeds of the American portion of that estate to the Scotch trustees, it is nevertheless true that the language employed by the testatrix is plain and unambiguous in excepting from the property disposed of in the Scotch will the property disposed of in the American will, and it was her manifest intention that the American will should be probated in Texas, and should govern in the disposition of her property in the United States.

■ But even if there had been but one will, the Scotch will, and it had been properly admitted to probate in Scotland, we are clear in the view that, in order to pass title to real estate in Texas, it was essential that it and its Scotch probate be filed in this state, in which case it was subject to contest under the provisions of R. S. art. 3352, regardless of its previous probate in Scotland or elsewhere. Appellant concedes that, but for the provisions of the treaty between the United States and Great Britain, this would be true. But

it is asserted that the treaty abrogated the Texas statute in the stated regard, and the courts of Texas are bound to recognize the Scotch probate.

To set forth appellant's contentions in its own language, it asserts the following as rules applicable to this contest:

"1. In order for the contestants to attack the will they must show a financial interest in the result if the will should be held valid. R. S. 1911, Art. 3236; Pena y Vidaurri v. Bruni (Tex. Civ. App.) 156 S. W. 315; Cyc., vol. 40, p. 1230; Parker v. Parker, 10 Tex. 83.

"2. And where question is made as to the interest of the contestant, the issue must be tried as are pleas in abatement. Brown v. Mitchell, 75 Tex. 13, 12 S. W. 606; Cyc., vol. 31, p. 130; Hazen v. Wright, 85 Me. 314, 27 A. 181.

"3. When a person dies, leaving a lawful will, all of his estate devised or bequeathed by such will shall vest immediately in the devisees or legatees. Mahle v. Grierson, 2 Willson, Civ. Cas. Ct. App. § 764; Parker v. Parker, 10 Tex. page 92; Watkins v. Huff, 94 Tex. 631, 64 S. W. 682; Kerr v. Riddle (Tex. Civ. App.) 31 S. W. 328; S. W. Tel. Co. v. Galveston County (Tex. Civ. App.) 59 S. W. 589; article 3314 R. S. 1925.

"4. In order to give reasonable effect to the Treaty with Great Britain validating testamentary dispositions of property by nationals of either country, the validity of the Scotch Will must be determined by the English laws.

"5. In Texas, without regard to Treaty rights, an alien may take both real and personal property by descent, inheritance or devise. Hanrick v. Gurley, 93 Tex. 458, 54 S. W. 347, 55 S. W. 119, 56 S. W. 330; S. W. Surety Co. v. Vickstrom (Tex. Civ. App.) 203 S. W. 389.

"6. Under all the decisions, a properly probated foreign will carries title to personal property located in the State without having been filed or probated under the Texas Statutes. Dew v. Dew, 23 Tex. Civ. App. 676, 57 S. W. 926; Holman v. Hopkins, 27 Tex. 38; Hurst v. Mellinger, 73 Tex. 188, 11 S. W. 184; Mills v. Herndon, 60 Tex. 353; Simpkin's Estates in Texas; Simpson v. Foster, 46 Tex. 624.

"7. Art. 3352, R. S. 1925, the only statute we have, which deals with a will 'probated according to the laws of any country out of the limits of the United States', authorizes the ancillary probate of such a will and then provides 'that the validity of such will may be contested in the same manner as the original might have been.'

"It will be noted that our laws make no provision for the contest of a foreign will except where an attempt is made to have it probated in Texas.

"8. Our courts recognize the rule stated in C. J. vol. 12, p. 466: 'The general principle that the disposition of personal property, valid at the domicile of the owner, is valid everywhere is of universal application. It had its origin in that international comity which was one of the first fruits of civilization, and in this age, when business intercourse and the process of accumulating property takes but little notice of boundary lines, the practical wisdom and justice of the rule is more apparent than ever."

Rules 6 and 8 may be eliminated from the discussion as immaterial, since testatrix had real as well as personal holdings in Texas, and whether the latter passed by the Scotch will independently of its Texas probate could have no controlling effect upon contestant's interest in the probate of the American will as affecting their claim to Texas realty.

We may concede the correctness of all the other rules except the fourth. Stated in other language and as appellant seeks to apply it to the instant case, that rule connotes the proposition that American courts must give full faith and credit to the probate in Great Britain of a will which affects the rights of British subjects, that such will does not require probate in America in order to effect the transfer of American realty, and is not subject to contest in an American court.

This proposition we believe wholly untenable. Appellant has not pointed out, nor have we been able to discover, anything in the provisions of the British Treaty or in the provisions of the treaties between our government and that of any other nation which could be given the construction contended for by appellant. We mention the treaties with other nations because the British treaty carries the most-favored nation clause. The provisions of the British Treaty (31 Stat. 1939), cited by appellant, read:

"Article I. Where, on the death of any person holding real property (or property not personal), within the territories of one of the Contracting Parties, such real property would, by the laws of the land, pass to a citizen or subject of the other, were he not disqualified by the laws of the country where such real property is situated, such citizen or subject shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary, and to withdraw the proceeds thereof, without restraint or interference, and exempt from any succession, probate or administrative duties or charges other than those which may be imposed in like cases upon the citizens or subjects of the country from which such proceeds may be drawn.

"Article II. The citizens or subjects of each of the Contracting Parties shall have full power to dispose of their personal property within the territories of the other, by testament, do-

nation, or otherwise; and their heirs, legatees, and donees being citizens or subjects of the other Contracting Party, whether resident or non-resident, shall succeed to their said personal property, and may take possession thereof either by themselves or by others acting for them, and dispose of the same at their pleasure, paying such duties only as the citizens or subjects of the country where the property lies shall be liable to pay in like cases."

If there is anything in these articles which does more for a British subject than to remove the badge of alienage, we are unable to discover it. Under article 5, the most-favored nation clause of the British Treaty, appellant cites article 6 of the Swedish Treaty, article 7 of the French Treaty, and article 4 of the German Treaty, which we quote:

"Article VI (Swedish Treaty). The subjects of the contracting parties in the respective states, may freely dispose of their goods and effects either by testament, donation or otherwise, in favor of such persons as they think proper; and their heirs, in whatever place they shall reside; shall receive the succession even ab intestato, either in person or by their attorney, without having occasion to take out letters of naturalization."

"Article VII (French Treaty). In all the States of the Union whose laws permit it, so long and to the same extent as the said laws shall remain in force, Frenchmen shall enjoy the right of possession personal and real property by the same title and in the same manner as the citizens of the United States. They shall be free to dispose of it as they may please, either gratuitously or for value received, by donation, testament, or otherwise, just as those citizens themselves."

"Article IV (German Treaty). Where, on the death of any person holding real or other immovable property or interests therein within the territories of one High Contracting Party, such property or interests therein would, by the laws of the country or by a testamentary disposition, descend or pass to a national of the other High Contracting Party, whether resident or non-resident, were he not disqualified by the laws of the country where such property or interests therein is or are situated, such national shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary, and withdraw the proceeds thereof, without restraint or interference, and exempt from any succession, probate or administrative duties or charges other than those which may be imposed in like cases upon the nationals of the country from which such proceeds may be drawn."

The above comment with reference to articles 1 and 2 of the British Treaty is equally applicable to the quoted articles of the Swedish, French, and German Treaties.

Appellant, while citing numerous authorities upon the construction and interpretation of treaties, has cited no case which upholds its view that they abrogate as to citizens of Great Britain the local laws with reference to the devolution of real property, which would apply to American citizens or any one else than British subjects, and to them except for the provision of the treaty. We think it unnecessary to discuss adjudicated cases upon a subject which seems so well established by authority.

" * * * It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated." United States v. Fox, 94 U. S. 315, 320, 24 L. Ed. 192.

Not only do the treaties in question not attempt to invade the province of the several states in this regard; but it may seriously be questioned whether an attempted exercise of that power would be valid.

"* * * A treaty is supreme only when it is made in pursuance of that authority which has been conferred on the treaty-making department, and in relation to those subjects the jurisdiction over which has been exclusively intrusted to Congress. If it should transcend these limits, like an act of Congress which transcends the constitutional authority of that body, it could not supersede a state law which enforces or exercises any power of the state not granted away by the Constitution. To hold any other doctrine than this would, if carried to its ultimate consequences, sanction the supremacy of a treaty which should entirely exempt foreigners from taxation by the respective states, or which should even undertake to cede away a part or the whole of the acknowledged territory of one of the states to a foreign nation." 15 R. C. L. pp. 151, 152.

We will conclude our discussion of this subject by the following excerpts from Tucker on Limitations on the Treaty-Making Power:

"Sec. 128. That the Government of the United States, under its treaty power may change the status of an alien in this country, cannot be denied. The change of that status, it is admitted, may give the right of inheritance which would be unavailing to him but for such change; but this right is conceded to him by reason of the fact that his status as an alien has been changed to that of native, quoad the particular right. All of the cases without exception, decided by the Supreme Court, involving the question of inheritance by aliens, are based upon one principle, and that is the power of the United States, under the treaty power to remove the badge

of alienage, which is conceded to be a legitimate exercise of power by the Government of the United States."

"Sec. 142. It may be urged that the concession of this power to its full extent in its effect upon alienage would give to the treaty-making power the right to confer upon aliens rights which would subvert our constitutional form of government. A fair consideration of the decisions leads to no such conclusion. It could not be claimed that under this power the alien could be given the right to vote, or to hold office, or to be the recipient of any of those great political rights which pertain to American citizenship. These rights rest in the law-making power alone. The right to open a barroom in America, despite the laws of the States, could not be granted in a treaty, though the reciprocal right be granted the American to do the same in the other contracting country. The decisions seem to extend only to the removal of certain badges of alienage, putting the alien on the same footing thereby with the American citizen as to certain privileges; and while Congress may by law prevent the coming of aliens to America, the treaty-making power may define his status if the bars are let down by Congress and he is allowed to come.

"The cases under consideration show most clearly that this has been the ground of their decisions; not that the treaty annuls the laws of the States supposed to be in conflict with it, but that under the laws of the States there was no power to defeat the alien's claim, because of his baptism into a limited sonship by the only power in the government that could bestow such a privilege.

"Sec. 143. It could hardly be held by the most extreme advocate of the unlimited treaty-making power that if the law of Virginia provided that the inheritance of real estate from a party dying intestate should go to his mother, and the law of Great Britain provided that in a like case the inheritance should go to the father, that a treaty between Great Britain and the United States giving the right to the British citizen to inherit real estate in Virginia according to the laws of succession of Great Britain and the reciprocal right of the Virginian to inherit real estate in England according to the laws of the residence of the Virginia citizen, would be valid. If such a treaty were valid it would be a clear example of the power of the treaty to annul a State law, but as we have seen, the cases under discussion are reconciled without resort to the conflict between the law and the treaty; and the heirs in each case took the inheritance under the law of the State, and not against it."

The error complained of in the trial court's refusal to direct a verdict is predicated solely upon the fact that Mrs. Kennedy, on July 19, 1923, executed a will in which she left all of her property to her husband, his heirs and assigns. Whatever probative force such fact might have as a circumstance in determining her mental capacity at the time she made the will in question, it could clearly have no conclusive legal effect in that regard. There can be no question but that the evidence was amply sufficient to support a finding of want of testamentary capacity in August, 1927, when the will offered for probate was made. All of the testimony shows that, in 1923 or 1924, Mrs. Kennedy had a serious spell of illness, and, while the witnesses do not agree as to the exact character of this illness, and their evidence presents a sharp conflict as to its subsequent effect upon her mental processes, there was ample evidence to go to the jury and support its finding that Mrs. Kennedy did not have testamentary capacity when she made the will. The 1923 will is not offered for probate, and we are not concerned here in its validity. The propriety of its inclusion in the record rests solely in its evidentiary significance.

The definition of "testamentary capacity" which is complained of is in the exact language of the definition which it was held error to refuse in Rutherford v. Robbins (Tex. Com. App.) 298 S. W. 549. The exact point urged against the definition is that it assumes that there were objects of testatrix' bounty who had claims upon her. We do not think the definition, when reasonably and fairly construed, is susceptible of this construction.

■ A number of assignments and propositions are predicated upon the admission of testimony of George Richardson, a brother of testatrix and one of the contestants, Bertha, Jane, and Walter Richardson, sisters and brother, respectively, of testatrix, but not appearing as contestants of record, and Mrs. George Richardson. The objection to the testimony thus offered is based upon article 3716, disqualifying parties in suits against administrators, etc. We do not think it necessary to set out in detail the substance of the testimony to which these objections were made. It can hardly be seriously questioned that the testimony concerned transactions with the deceased within the holding in Holland v. Nimitz, 111 Tex. 419, 232 S. W. 298, 239 S. W. 185. The main contention of appellees in asserting the admissibility of the testimony is that this proceeding is not of the character of those named in the statute. The exact point made is in effect that, since the proceeding was instituted by the bank for the purpose of probating the will, it could not be classified as a suit by or against an executor as such, because the bank's status as executor could not arise until the will had been admitted to probate. We concede the force of this argument and that the proceeding is not one in which a judgment could be rendered for or against the executor as such. How-

ever, it is perfectly clear we think from the holdings of the Supreme Court in Leahy v. Timon, 110 Tex. 73, 215 S. W. 951, and Holland v. Nimitz, above, that a probate proceeding is an action involving the title to the testator's estate, in which the proponent on the one hand and the heirs on the other occupy the position of the respective parties to the proceeding, and that, within the meaning of the statute in question, it is an action in which judgment may be rendered for or against the heirs of the testatrix as such. That being the character of the proceeding, it necessarily follows that neither party could testify over the objection of the other to conversations or transactions with the deceased. George Richardson was both a nominal and real party, in that he was one of the contestants. The other three named witnesses were heirs at law of Mrs. Kennedy, and were therefore parties in fact to the proceeding. We think there can be no substantial question but that each of these four parties was disqualified to give the testimony complained of, and we sustain the assignments and propositions in this regard.

The testimony of Mrs. George Richardson was admissible under the holding in Mitchell v. Deane (Tex. Com. App.) 10 S.W. (2d) 717.

The only other questions presented in the appeal are those involving objections to testimony of other witnesses not coming within the above disqualification, to the effect that in their opinion Mrs. Kennedy was not of "disposing mind" at the time she executed the will. The objection is directed to the use of the word "disposing" as calling for a conclusion of the witness. Under the holding in Brown v. Mitchell, 88 Tex. 350, 31 S. W. 621, 36 L. R. A. 64, this objection was well taken, and we sustain the proposition and assignments urging it.

For the errors pointed out, the trial court's judgment is reversed, and the cause remanded for a new trial.

Reversed and remanded.

On Motion to Find Conclusions of Fact.

In compliance with paragraphs 2 and 3 of appellees' motion to find conclusions of fact, we sustain the objection to the testimony of the following witnesses contained in the following points on the following respective pages of appellants' brief:

George Richardson—point 7, page 51; point 10, page 58.

Bertha Richardson—point 8, page 55; point 9, page 57; point 18, page 70; point 20, page 72; point 32, page 81.

Walter Richardson—point 11, page 60; point 12, page 60; point 21, page 72; point 22, page 72; point 23, page 73; point 31, page 80.

Jane Richardson—point 14, page 67; point 17, page 69; point 24, page 73; point 30, page 79.

Kate Campbell—point 13, page 65; point 16, page 69.

Wm. R. J. Graham—point 15, page 68; point 29, page 78.

Jane Flemming—point 27, page 76.

Jennie Flemming—point 28, page 77.

In all other respects the motion is overruled.

Granted in part, and in part overruled.